**FISHER v. EVERETT et al.**

No. A–3801.

District Court of Alaska. Third Division. Anchorage.

Oct. 29, 1945.

George B. Grigsby and Stanley J. Mc-Cutcheon, both of Anchorage, for plaintiff.

Davis & Renfrew, of Anchorage, and L. V. Ray, of Seward, for defendants.

DIMOND, District Judge.

The dispute here is between rival operators of set or anchored gillnets, hereinafter called set nets, engaged in fishing for salmon in the tidal waters of Alaska. The plaintiff sought to enjoin the fishing operations of the defendants, claiming his own fishing to be lawful and that of the defendants unlawful, and for damages. The defendants asserted the validity of their own fishing, and sought damages.

All such fishing is rigidly controlled by law of the Congress of the United States, and by regulations of the Secretary of the Interior made pursuant to law and having the effect of law. The relevant statutory provisions and the applicable regulations are quoted below:

Sec. 1. "That for the purpose of protecting and conserving the fisheries of the United States in all waters of Alaska the Secretary of the Interior from time to time may set apart and reserve fishing areas in any of the waters of Alaska over which the United States has jurisdiction, and within such area may establish closed seasons during which fishing may be limited or prohibited as he may prescribe. Under this authority to limit fishing in any area so set apart and reserved the Secretary may (a) fix the size and character of nets, boats, traps, or other gear and appliances to be used therein; (b) limit the catch of fish to be taken from any area; (c) make such regulations as to time, means, methods, and extent of fishing as he may deem advisable. From and after the creation of any such fishing area and during the time fishing is prohibited therein it shall be unlawful to fish therein or to operate therein any boat, seine, trap, or other gear or apparatus for the purpose of taking fish; and from and after the creation of any

such fishing area in which limited fishing is permitted such fishing shall be carried on only during the time, in the manner, to the extent, and in conformity with such rules and regulations as the Secretary prescribes under the authority herein given: Provided, That every such regulation made by the Secretary of the Interior shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of the Interior. The right herein given to establish fishing areas and to permit limited fishing therein shall not apply to any creek, stream, river, or other bodies of water in which fishing is prohibited by specific provisions of this Act, but the Secretary of the Interior through the creation of such areas and the establishment of closed seasons may further extend the restrictions and limitations imposed upon fishing by specific provisions of this or any other Act of Congress; Provided further, That the Secretary of the Interior is hereby authorized to permit the taking of fish or shellfish, for bait purposes only, at any or all seasons in any or all Alaskan Territorial waters.

"It shall be unlawful to import or bring into the Territory of Alaska, for purposes other than personal use and not for sale or barter, salmon from waters outside the jurisdiction of the United States taken during any closed period provided for by this Act or regulations made thereunder." Act of June 18, 1926, 44 Stat. 752, 48 U.S. C.A. §§ 221–224; Sections 61, 62 and 65, Compiled Laws of Alaska 1933.

Sec. 209.2. "* * * commercial fishing for salmon is prohibited prior to 6 o'clock antemeridian, May 25 * * *."

Sec. 209.10. "No set or anchored gill net shall exceed 35 fathoms in length measured on the cork line. The total aggregate length of set or anchored gill nets used by any individual or operated from any boat shall not exceed 105 fathoms. * * *"

Sec. 209.12. "The distance by most direct water measurement from any part of one set or anchored gill net to any part of another set or anchored gill net or trap shall not be less than 600 feet."

Salmon Fishery Regulations for 1945.

Since the year 1926, the defendant Everett and her predecessors in interest have owned a tract of land in area about 56 acres, situated at Trading Bay, on the west shore of Cook Inlet, Alaska. The tract fronts on the beach, easterly and westerly, following the meander of the mean high tide line for about 1,620 feet and extends virtually at right angles inland a distance of approximately 1,500 feet. Five or six small buildings are located on the tract near the southwest corner adjacent to the beach, one of them being a barely habitable dwelling house and the other smaller buildings being used for various purposes. The tide run in Cook Inlet is substantial and the beach in front of the tract described slopes gradually to the deep waters of Cook Inlet so that at low tide more than a mile of beach, which is covered at high tide, is exposed. The beach is thus suitable for set net fishing and since 1926 defendant Everett and her predecessors in interest have claimed the right to exclusive use of the beach area lying between the tract above described and deep water, for set net and trap fishing, and have actually used it for such purposes each year.

The defendant Hale is an associate of defendant Everett for the fishing operations but has no interest in the land. He is not a fisherman by trade and never actually set or placed a commercial set net before May 25, 1945.

The plaintiff is a fisherman, and in the years 1942, 1943 and 1944 he operated for the defendant Everett a series of four set nets lying directly between the property of the defendant Everett above described and the deep waters of Cook Inlet, extending seaward from a point near the southwest corner of said property, in an approximately straight line with 600 foot intervals between the several nets. The 1943 and 1944 contracts between defend-

ant Everett and the plaintiff are as follows:

"Agreement for 1943

"This agreement, entered into this 27 day of Apr. 1943, by and between M. M. Everett and Luke L. Fisher, both of Anchorage, Alaska, is as follows:

"Mr. Fisher agrees to fish four (4) net sites on the lower side of M. M. Everett Trap No. 1 (same locations as last season) throughout the king and red salmon season of 1943, and to observe and be responsible for compliance with any and all government and Territorial rules and regulations in that area in Cook Inlet during the 1943 season.

"Mr. Fisher also agrees to take proper care of all nets and gear, such as bluestoning nets once a week and after the season and to store all gear in Anchorage at mink shed owned by Mrs. Everett at her old mink ranch. Dory to be put up at same place as last fall near said shed.

"Mrs. Everett agrees to furnish for Mr. Fishers use during the 1943 season the following: 1 dory, oars and oar locks, 1 outboard motor and oil can for same, 4 king salmon nets, 4 red salmon nets, plus some extra nets for replacement in case some of the nets become unusable, hanging twine, mending twine. Mrs. Everett also agrees to pay to Mr. Fisher two-thirds of the money received for fish from 4 said sites. Signed by—M. M. Everett Signed by—Luke Fisher."

"Agreement

"I hereby agree to accept employment from Mrs. Myrtle M. Everett on her fishing site near Tyonek, on Cook Inlet, Alaska, under the same terms and conditions as I was employed by her in 1943. Dated, at Anchorage, Alaska, this 27 day of March 1944. Luke C. Fisher. Witnesses: F. M. Hale, Selter N. Hale."

The record shows that in 1942 the plaintiff fished the same site for the defendant Everett under a similar contract, except that the plaintiff's compensation for that year was one-half of the gross amount received for the fish caught.

On April 22, 1945, the plaintiff proceeded to the area in question and drove five stakes, to which set nets were later attached, in the beach commencing near the southwest corner of the tract of land mentioned, and extending out toward deep water. All of said stakes were driven in land which was part, of the public domain and none of them in the tract owned by the defendant Everett. The plaintiff also posted a sign on the beach bearing his name and a number. On May 11th the plaintiff drove additional stakes so that he had in all enough stakes to equip four set nets, each 25 fathoms long, extending from the high tide line or above towards the deep waters of Cook Inlet, with intervals, as required by the regulations, of at least 600 feet between nets.

On May 11th the defendant Hale drove similar stakes on the beach, to which set nets were later attached, in front of the southwest end of the Everett tract of land and extending out also toward the deep waters of Cook Inlet. All of the stakes mentioned were driven deep in the earth so as to project only about 6 inches above the ground.

Uuder the law and regulations, as indicated above, no one was permitted to set or operate a set net before 6:00 o'clock in the morning on May 25th. While the testimony on the subject is conflicting in some respects, it appears that promptly at 6:00 o'clock in the morning of that day the plaintiff began to set what he called his No. 1 net, that is to say, the one nearest to the beach. It is evidently the custom to call the net nearest the beach the No. 1 net and the others Nos. 2, 3, and 4, as progress is made further out from the beach toward deep water. After setting the No. 1 net the plaintiff proceeded to set his No. 2 and No. 4 nets, but his No. 3 net was not set until the morning of Monday, May 28th. The defendant Hale asserts—and in this he is supported by the testimony of others—that he commenced to set his No. 2 net at 6:00 o'clock in the morning of May 25th, but being unskillful, some hours passed before he was able to complete the setting of all four nets, including his No. 1 net which was

set last; that after commencing to set his No. 2 net the defendant Hale worked at the job assiduously until the setting of that net had been completed.

I find that the plaintiff's No. 1 net was set before the defendants' No. 1 net; that the setting of defendants' No. 2 net was at least commenced first, before the plaintiff started to set his No. 2 net, and that the defendant Hale worked perseveringly at the setting of his No. 2 net until the installation had been completed; that the defendants' No. 3 net was set several days before the plaintiff's No. 3 net; that there is no conflict whatever between the No. 4 nets of the plaintiff and defendants and therefore they may be disregarded. Therefore I find that as to No. 1 net, the plaintiff enjoys priority in time and right, and as to Nos. 2 and 3 nets the defendants have priority.

The regulations forbid nets to be set or operated within 600 feet of each other. On June 1st an agent of the government Fish and Wildlife Service found the nets of the plaintiff and the defendants to be within prohibited distance. Their No. 1 nets were within 40 feet of each other; their No. 2 nets approximately 150 feet apart, and their No. 3 nets approximately 200 feet apart. Being unable to determine which were the legal and which the illegal nets as then in place and operated, the agent seized and took in his possession all six nets, the Nos. 1, 2 and 3 nets of the plaintiff and the Nos. 1, 2 and 3 nets of the defendants. Shortly thereafter the plaintiff brought this action, and upon the preliminary hearing the defendants were enjoined from placing a net within 600 feet of the plaintiff's No. 1 net, and the plaintiff was in like manner enjoined from placing any nets within 600 feet of the defendants' Nos. 2 and 3 nets. The cause was submitted finally to the Court upon the evidence taken at the hearing for preliminary injunction.

While no claim is made by the defendants, or either of them, to any priority or any prescriptive right by reason of ownership of the upland, it is vigorously urged on behalf of the defendant Everett, and through her asserted rights on behalf of the defendant Hale, that the defendant Everett has first and prior and paramount right to fish set nets on the locations above described, occupied and operated by the defendants in 1945, and extending seaward from a point near the southwest corner of the upland tract owned by defendant Everett, by reason of the fact that the defendant Everett and her predecessors in interest have operated set nets on this location during the fishing season of each year since 1926 and their rights have never been seriously contested before; that the defendant Everett enjoys such rights by reason of long-continued usage and by established and unbroken custom. Several witnesses testified as to the custom and the point is of such consequence that a condensed statement of their testimony is given below:

Testimony of plaintiff:

"This is my fourth year of fishing in Alaska. I have always been a member of the Alaska Fishermen's union until this year. From my past experience I know it has been a custom that one member of the union would not jump another's claim. The understanding was that if a man fished at a place one year and the same fisherman went back the following year to fish his site, he was entitled to it. And if he didn't go back it was abandoned on the day following the opening of the season and another could take it. I have been acquainted with Mrs. Everett for the past three years. I have entered into written contracts with her whereby I fished her site in 1942, 1943 and 1944 and I identify the papers being handed to me as bearing my signatures, and as the contracts for the years 1942, 1943 and 1944 which I had with Mrs. Everett in connection with the fishing location at Trading Bay. Those contracts do not have reference to the fishing location that I am fishing now, but the fishing locations that I fished for Mrs. Everett for the years 1942, 1943 and 1944 which are within 100 feet of the present site where I am fishing. My beach net is 40 feet from her beach net."

Testimony of witness Robert Weimer:

"My name is Robert Weimer. At present I am a paid temporary fishing agent for the Alaska Fishermen's Union. I have

been engaged as a fisherman in the Third Division of Alaska since 1937 and fishing has been my principal livelihood. Since 1937 the Alaska Fishermen's Union has been the controlling bargaining agency for the Alaska Cook Inlet fishermen and that condition prevails at the present time. To the best of my knowledge in the year 1937 a motion was passed at a regular meeting of the Alaska Fishermen's Union to the effect that a member of that union would not jump a claim of another member fishing the same site year after year. Regardless of that motion, it is the custom not to jump the claim of other members and that has been the custom since I have been in the union. I have heard very few instances of a member jumping another's fishing site. To my knowledge the union by-laws contain no stipulation as to any set amount of fine for violation of the custom. We had an agreement that we would not take someone else's locations who had prior rights, or the ones who had fished there the year before. I am acquainted with the fishing sites on Cook Inlet and of Mrs. Everett's on Trading Bay. To my knowledge she has fished that site since 1937 and I believe before. I know Luke Fisher, the plaintiff in this action. He testified here he was not a member of the Alaska Fishermen's Union but the records will show he is carried as a member of the Alaska Fishermen's Union; he hasn't turned in his book yet."

Testimony of witness Harvey J. Smith:

"My name is Harvey J. Smith. I have resided in this vicinity for 22 years. In the past I have been an officer of the Alaska Fishermen's Union and was agent of that union for 2 years. I was acting agent for 1 year. For about 4 years I acted as an official. I think Mr. Weimer has described the custom of recognizing one fisherman's site from year to year; he has a good conception of it; that the Fishermen's Union would respect rights of prior occupancy and I believe it is the same now. There is no law or regulation which legally protects the rights, therefore it was necessary by a gentlemen's agreement to recognize a policy to prevent confusion and trouble. As I recall the 4 years I was

active in the organization it was respected 100%. I have known of no deliberate violations. I recall something in the rules or customs which gave preferential rights to widows as such. I think the first case of that arose in the union was Mrs. Frank Smith who lost her husband by drowning on the beach and they let her have the location the next year. Mrs. Everett's husband did fish those locations but I don't recall just when she lost her husband. My understanding is that it was on account of his exercise of those fishing rights that her rights to the site have been respected. I don't think there was any controversy about it or any controversy that she was fishing too many locations."

Testimony of defendant Everett:

"I am a member of the Alaska Fishermen's Union. I have been such a member since 1937, just about since it was organized. With respect to any regulation or custom or resolution of the union concerning the protection of fishermen on sites which they have continuously fished from year to year, that is what they called a gentlemen's agreement and it has been in force since then. I haven't known of any other places being jumped. With respect to any previous trouble, one time some men put their stakes out early. I took it up with the Union and told them I would notify the Fish and Wildlife Service so that none of us would get the fish. They moved their stakes on the 23rd of May before the fishing season began. That was the only other instance."

The plaintiff testified that he was no longer a member of the Alaska Fishermen's Union but was president of another union, the Western Alaska Fishermen, Cannery and Allied Workers, F.T.A. Local 260, organized in March, 1945, and he claimed that that union represented better than 70% of the gillnetters of upper Cook Inlet. It appears that the plaintiff therefore declined to be bound longer by any union rule of the Alaska Fishermen's Union or by any custom which had been established through the agency of that union, as respects the operation of a location or site for set net fishing, to carry over from one year to the next. Whether the new union was organ-

ized by the "have nots" against the "haves," of set net fishing in the Cook Inlet area, is not clear. However there was introduced in evidence a revealing letter written by R. R. Warren, executive secretary of the union, to the defendant Everett. Since this letter tells a story of its own, as bearing on the customs or practice or union rule above adverted to, it is quoted in part below:

"Western Alaska Fishermen Cannery & Allied Workers

"F.T.A.—Local 260

"Anchorage, Alaska

"June 5, 1945

"Mrs. Everett

"Trading Bay, Alaska

"Dear Mrs. Everett:

"This letter is to inform you that the canneries have agreed not to accept fish from anyone who is not a member of the Western Alaska Fishermen, Cannery and Allied Workers, Local 260. Our books are open, and you are eligible for membership provided you meet the requirements stated in the Constitution. It is not our intention to work a hardship upon anyone, but in order to have the protection and security as a fisherman, it is absolutely necessary that you abide by the Constitution and By-laws. Upon your signing of a pledge card to Western Alaska Fishermen, and fishing with legally prescribed gear (which is 100 fathoms), this will allow the canneries to take your fish.

"There are many inconsistencies in your agreements and arrangements as concerns fishing. For your information, you have no control over the beach. The law definitely states that ground within 60 feet of the high-water mark is public domain. The fact that you have a factory site or a homestead on Cook Inlet does not in any way give you jurisdiction, control or ownership of the beach, fishing rights, or the ground within 60 feet of the high-water mark.

"You are by law entitled to fish 100 fathoms of gear net and no more. This Union will protect your right to the same if you comply in all other matters with the policy and program, written or unwritten, of the fishermen of Cook Inlet.

"A pledge card is or will be available for your signature. If you do not see fit to sign the same, and abide by the rules and regulations of the Fish and Wildlife Service and this Union, it is now definitely stated that by one means or another, you will be barred from any participation in the fishing industry. It is imperative that you understand that this organization will not continue in any way whatsoever to allow persons not amendable to this organization to continue to fish. This statement should be amended to say that you may fish by law anywhere you see fit, but this organization will see that you do not sell fish to any commercial packer in Cook Inlet.

"Celter Hale is not a fisherman. This situation will be met and dealt with forceably if necessary by this organization. You are entitled to fish four sites or 100 fathoms of *year*. And other deals or arrangements you might make are an evasion of the law, contracts, personal and private, agreements to the contrary. If you wish to continue fishing, it would be well to consider there are 300 odd members or more who are against your policy and program. In fact, enough membership so that the canneries will not and cannot accept any fish you might catch in opposition to the new organization.

"The captains of all the boats from Emard Packing Co. and General Fish Company have been instructed not to accept fish from fishermen not in the Western Alaska Fishermen, Cannery and Allied Workers, Local 260.

"This letter is by the way of explanation and for your information. There will be no deviation from our set program. You are to abide by our Constitution and By-laws, or you will not be able to sell any fish commercially. This is not a threat, it is a direct statement of fact.

"Your position is none too secure, and due only to the consideration of the fact that you are a widow has there not been more drastic action taken. Your methods are not above reproach and continuance of the same will lead to an absolute boycott of any fishing operations that you may contemplate now or in the future. It would be well for you to understand that there will be no period of grace or leniency, no deviation from the principles or practice

as outlined by the Constitution of the new organization. In other words, you will abide by the same or we will take such steps as are necessary to prohibit any further activity in the fishing industry by yourself.

"Respectfully yours,
"R. R. Warren
"Executive Secretary"

It is, of course, admitted that neither the law nor the regulations provide for the recognition of such a custom as has been claimed by the defendants for their protection. In fact the law itself appears to negative the idea, for we find in the statute the following provision:

" * * * that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of the Interior."

The history of this legislation, namely, the Act of June 6, 1924, as amended by the Act of June 18, 1926 (above set out in full so far as relevant), indicates that Congress declined to grant any vested right, or any "exclusive or several right" of fishery, in the waters of Alaska. Nowhere can there be found the slightest evidence of any intent of Congress to provide for a continuing exclusive right of fishery in any certain area to be exercised from year to year. In this connection it is to be remembered that Cook Inlet is a tidal arm of the ocean and that during the winter months the entire surface of the waters of the Inlet are covered with heavy broken masses of ice which move with the tide. No net and no stake projecting far above the tidal flats of the Inlet could possibly stand from year to year. In fact the nets operated are always taken up at the end of one fishing season and not put out again until the commencement of another fishing season. That is required by the law and regulations.

The attention of the Court has been invited to the existence of custom or local law or regulation with respect to mining lands. The general mining laws of the United States which were extended to Alaska by the Act of June 6, 1900, 31 Stat. 321, brought to Alaska the provisions of R.S. § 2324, 30 U.S.C.A. § 28, which reads in part as follows:

"The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements: * * *."

And in Section 26 of the Act of June 6, 1900, 48 U.S.C.A. § 381, mentioned above, we find recognition of "reasonable rules and regulations as the miners in organized mining districts may have heretofore made or may hereafter make governing the temporary possession thereof for exploration and mining purposes until otherwise provided by law", and also the following: "that the rules and regulations established by the miners shall not be in conflict with the mining laws of the United States * * *."

No such recognition of local rules, regulations or customs are to be found in any of the laws governing the taking of salmon in the tidal or other waters of Alaska, and therefore, in view of the explicit provisions of the Act of June 18, 1926, no such customs or union rules or regulations may be recognized by judicial decree.

The existence of custom was urged in the case of Canoe Pass Packing Co. v. United States, 9 Cir., 270 F. 533, 535, but the custom there, if it existed at all, was of brief duration and the court rejected the alleged priority based upon that ground. Nor is there anything in the opinion of the Circuit Court of Appeals in that case which would reasonably sustain the contention of the defendants here, as to right based upon custom, as indicated in the following quotation from the Canoe Pass case:

"The rulings of the court below, in denying that contention and in excluding testimony offered to show a custom adopted by the fishermen in that section of Alaska for securing fishing locations, are assigned as ·

error. The offer was to prove a custom and usage that, when a fisherman went on the ground and made his location, by putting up a stake with location notices and attaching a net thereto, and thereafter living on that location, he acquired a right to fish there. But it is obvious that no such custom or usage could have been established in the few months of the life of the statute. The laws and regulations concerning fishing in Alaska waters do not undertake to give exclusive rights of fishing, or to license the use of set nets at specified points on the shores of streams or lakes, and there remains in the general public a common right to fish in all the public waters of the territory.

" 'As a general proposition a claim of an exclusive right to fish in a certain part of navigable waters must be based on some statutory enactment of the state having jurisdiction over such waters, though, if the right is one which may be granted, a legal grant may be presumed from a prescriptive user.' 11 R.C.L. 1026.

"We think that the court below correctly ruled that—'The law provides no method by which, through occupation or attempted occupation prior to said hour and date, one can initiate any exclusive right to a designated place or point on the shore of said Miles Lake.' " Canoe Pass Packing Co. v. United States, supra.

■ Neither the plaintiff nor defendants gain priority of right by driving stakes in the beach to which afterwards nets may be affixed, if the stakes are driven before the hour set for the opening of fishing. The testimony shows beyond dispute that the plaintiff drove most of his stakes on the 22nd of April and also put up a sign on the beach containing his name and a number perhaps that of his license; but all this avails him nothing. The defendant Hale also drove stakes on May 11th, but that fact did not give him or his co-defendant any priority of right. The defendant Hale testified, undoubtedly quite truly, that the beach is covered with stakes, and so it is a wonder that anybody takes trouble to drive new ones. But perhaps the new ones are driven with the hope at least that some sort of precedence or priority can thus be established.

A similar claim as to alleged priority based upon signs and stakes, was disposed of in the Canoe Pass case, supra. In addition to the quotation from that opinion set out above, the court made this observation:

"But, under the law which we have to consider in the present case, no right could begin prior to a specified day and hour, and he who after that hour placed in the water a set net within the prohibited distance from another set net which was lawfully there was guilty of a violation of the law." Canoe Pass Packing Co. v. United States, supra, 270 F. at page 536.

■ ■ The rule with respect to the right of occupation of such sites or locations has been expressed clearly on several occasions by the judges of the District Court of Alaska, and that rule is that he who first actually occupies a certain location or site for the purpose of fishing that site with any particular type of fixed gear, is entitled to it, because he is in possession of it and his possessory right is stronger than the right of anyone else who goes into possession of and occupies a site within the prohibited distance at a later date. And the rule goes a bit further than that: he who first, in good faith and with proper and adequate means begins the occupation of such a site, will be protected in his priority, provided he diligently brings his works to completion so as actually to fish the site, and will not lose his priority to someone who commences to occupy a site within prohibited distance at a later date but who, by reason of greater wealth or greater strength or greater skill, is able to complete his work and thus begin fishing first. Nothing in the rule as established indicates that it may be stretched to cover continuous operation of any person of a particular site year after year. Salmon fishing is seasonal and extends for only a few months each year at most. Set nets may not be kept in place or operated beyond the end of the season. Even as to traps, most of them are almost entirely removed at the end of each season, or carried away by storm during the succeeding winter, and the parts of them remaining in place may not take fish or be equipped to do so during the closed season.

While the printed reports are barren of any cases bearing directly on the point at issue as respects set nets, except the Canoe Pass case, supra, the doctrine as to priorities concerning traps has been discussed and decided in several reported cases. The principle is the same, because both fish traps and set nets are fixed gear attached to the land underlying the shallow coastal waters. The following quotations are taken from the opinions in several Alaska cases bearing directly on the subject as regards traps:

"We have seen that the right of fishery in tidal waters is a public right, common to all. It cannot, therefore, be exclusive in any individual, and hence cannot be such a right as may be obtained by prescription. Pacific Steam Whaling Co. v. Alaska Packers' Association, supra, [138 Cal. 632, 72 P. 161]. See, also, notes, 14 L.R.A. 386, and 42 L.R.A. 311. But, while the right of fishery in tidal waters cannot be exclusive, every characteristic of the right of fishery, which is defined by a learned text-writer as 'a right to employ within a particular stretch of water lawful means for the taking of the fish which may be found there' (2 Farnham on Waters and Water Rights, 371), as well as the characteristics of the fish, renders impossible in many instances, as in the case at bar, the exercise of the right by two individuals at a particular spot at one and the same time. In some states, provision for such a contingency has been made by statute. Not so here, however. Experience long ago taught the impossibility of two persons simultaneously exercising the right at the identical spot, and it has long been the rule, framed at the dictate of natural reason, equity and justice, that the right of fishery in tidal waters at a particular spot is dependent upon: First, a priority of possession; and, second, upon the maintenance of that possession.

" 'No person can acquire a right of fishery superior to any other unless he has gone into the common waters and set up and established his pounds and stakes, and taken possession of the line which those pounds and stakes include. With these a stranger cannot interfere.' 2 Farnham on Waters and Water Rights, § 394.

"But the defendants urge that eight piles and a dolphin do not make a fish trap, nor do they constitute pounds and stakes. That is undoubtedly true, but every man is entitled to a reasonable time in which to complete his fish trap, where he exhibits diligence and good faith. Of these essentials the acts of plaintiff bear every evidence. Before he had a reasonable time to complete his work, defendant appeared, and by his acts rendered plaintiff's labor useless." Hampton v. Columbia Canning Co., 3 Alaska 100, J. Gunnison, reversed on other grounds, 9 Cir., 161 F. 60.

"As there is no statute indicating the method by which fish trap sites in Alaska waters can be acquired, and no statute adjusting the rights of fish trap owners inter sese, we are forced to inquire whether there is any general principle of law governing the case. We are urged to hold that the law of possession applies, and that he who is prior in time should be adjudged to be prior in right. No doubt that principle is to be applied so far as fish traps actually constructed are concerned, for any one who actually incloses a space of water and is in the actual use and occupation of it for fishing purposes may maintain his inclosure as against any one who cannot show a better right; but this is so because he has an actual possession, a possession which, if it were land, would be called a pedis possessio. He has his foot upon that part of the ocean, and he is using it for the purposes for which it is fit, and consequently he has a superior right, because he is there first. He has the right, because he is in possession of and actually using that particular area of water * * *." Thlinket Packing Co. v. Harris & Co., 5 Alaska 471, J. Jennings.

"The first one acquiring actual peaceable physical possession of a location on unoccupied public land of the United States, not reserved from such location, placing substantial improvements thereon, continuing the same to completion with reasonable diligence, and maintaining same for a lawful purpose, acquires the better right. All acts of giving notice or preparation, through thought, words, or acts, become immaterial, so it is not necessary to consider the matter of applying for or securing permits, licen-

ses, or materials." Alitak Packing Co. v. Alaska Packers' Ass'n, 6 Alaska 277, J. Brown.

"I find no reason to hold the plaintiff's trap unlawful. The evidence shows that it was at the site of its trap, and actively engaged in constructing it, and had it well under way before the defendant Smith had taken any steps at the site of his trap to erect a trap. There is evidence tending to show that on the 5th or 6th day of May, 1927, defendant Smith knew of the change made May 4th in the withdrawal order, by which the two-mile limit from the mouth of Chuit river was reduced to one mile. Had he at once commenced work on a trap at the point where he now is, he could have forestalled the plaintiff, who did not commence until the morning of May 7th. The defendant would not have been required to first complete his trap; but it seems to me plain that he was required to first commence it, and thereafter to proceed with reasonable diligence to complete it, in order to appropriate that fishing site. Failing in this, he acquired no rights." Alaska General Fisheries v. Smith, 7 Alaska 635, 637, J. Hill.

For convenience there is appended below a list of the most important relevant judicial opinions, chronologically arranged: Shively v. Bowlby, 1892, 152 U.S. 1, 14 S.Ct. 548, 38 L.Ed. 331; Sutter v. Heckman, 1st Div., J. Brown, M. C., 1900, 1 Alaska 81, same case, Heckman v. Sutter, 1902, 9 Cir., 119 F. 83; Id., 9 Cir., 1904, 128 F. 393; Pacific Steam Whaling Co. v. Alaska Packers' Ass'n, 1904, 138 Cal. 632, 72 P. 161; Hampton v. Columbia Canning Co., 3 Alaska 100, 1st Div., J. Gunnison, 1906, on appeal, reversed Columbia Canning Co. v. Hampton, 9 Cir., 1908, 161 F. 60; Thlinket Packing Co. v. Harris & Co., 5 Alaska 471, 1st Div., J. Jennings, June 6, 1916; Harris & Co. v. Thlinket Packing Co., 5 Alaska 493, 1st Div., J. Jennings, June 29, 1916; Columbia Salmon Co. v. Berg, 5 Alaska 538, 3d Div., J. Brown, Fred M., Aug. 26, 1916; Alitak Packing Co. v. Alaska Packers' Ass'n, 6 Alaska 277, 3d Div., J. Brown, 1920; Canoe Pass Packing Co. v. United States, 9 Cir., 1921, 270 F. 533; Alaska General Fisheries v. Smith, 7 Alaska 635, 3d Div., J. Hill, July 13, 1927.

 This is a proper case for injunctive relief. Denial thereof in such conditions might conceivably lead to armed conflict. The provisions of the Alaska code, Sections 3888 to 3893 inclusive, Compiled Laws of Alaska 1933, seem ample to warrant the action here taken. That injunctive relief is proper in such cases is sustained in several cases above cited, namely: Hampton v. Columbia Canning Co.; Thlinket Packing Co. v. Harris & Co.; Harris & Co. v. Thlinket Packing Co.; and Alaska General Fisheries v. Smith.

For the 1945 fishing season the ruling is: (1) That the plaintiff had paramount right to the site of his No. 1 net; (2) that the defendants had paramount right to the sites of their Nos. 2 and 3 nets; (3) that the plaintiff's Nos. 2 and 3 nets were unlawfully set and fished; and (4) that the defendants' No. 1 net was unlawfully set and fished.

Under the circumstances neither party is entitled to damages and each party should pay his or her own costs.

Findings and decree accordingly.