## LIND v. MARKLEY.

### No. A–6958.

District Court, Alaska.
Third Division, Anchorage.
May 9, 1952.

Medley & Haugland, Seattle, Wash., John E. Manders, Anchorage, Alaska, for plaintiff.

McCutcheon & Nesbett, Anchorage, Alaska, for defendant.

DIMOND, District Judge.

By the Act of June 18, 1926, 44 Stat. 752, 48 U.S.C.A. § 220 et seq., the Secretary of the Interior is granted the power to regulate the fisheries of Alaska including the salmon fishery. That power is exercised through general regulations promulgated each year. With respect to the regulations the Act contains the following:

"Provided, That every such regulation made by the Secretary of the Interior shall be of general application within the particular area to which it applies, and that no exclusive or several right of fishery shall be granted therein, nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shellfish in any area of the waters of Alaska where fishing is permitted by the Secretary of the Interior."

For the year 1951 the Secretary of the Interior promulgated the customary regulations including regulations here applicable concerning the operation of set nets in the Cook Inlet fishing area of Alaska. Among those regulations are the following:

"109.10 Total aggregate length of set nets. No set or anchored gill net shall exceed 35 fathoms in length measured on the cork line. * * *"

"109.12 Minimum distance between units of gear. The distance by most direct water measurement from any part of one gill net or seine to any part of another gill net, seine, or trap shall not be less than 600 feet."

The defendant Markley for several years prior to 1951 had operated set gill nets

on the shore of Cook Inlet at Trading Bay, Alaska, for the taking of salmon. Normally such nets are anchored to stakes driven in the mud flats of the Inlet and supported by floats or buoys. They are almost invariably so placed as to be at right angles to the movements of the tides. For the convenient operation of his nets in this vicinity Markley, prior to 1951, had purchased adjoining shore lands for the sum of $3,500, paying therefor the sum of $500 in cash, the balance to be paid in annual installments of $500 each. The nets mentioned can be operated in the area only during the fishing season which begins in May and ends in August or September of each year, the exact dates and hours being fixed each year by the Regulations of the Secretary of the Interior and administered through the Fish and Wildlife Service of that Department.

Net sites of the type here involved are of substantial value because the operator may take salmon during each season of the sale price of between $1,000 and $2,500, the exact amount taken each year depending upon the volume of the salmon run. The sale price of salmon caught in such nets in 1951 varied between $4 and $4.50 apiece.

In 1951 the season opened on the 28th day of May at the hour of six o'clock in the forenoon. It is established law that prior to that hour no one could set a net and that the placing of a net before that hour would have been a penal offense. It is usual, however, for the persons who intend to fish with this type of gear in that area to drive their stakes to which to anchor nets and to accumulate their gear before the hour so as to be ready to put out their nets promptly upon the opening of the season, in this instance at six o'clock a. m. on May 28.

The defendant confidently anticipated that he would set his nets in this area in the same places or substantially the same places occupied by them in previous years. It has been and is the custom of fishermen with this type of gear in this area not to invade each other's locations that have been occupied in previous years. The testimony indicated that each fisherman who had operated a net in any particular area during the previous year would be afforded a reasonable time after the opening of the season within which to set his net and commence fishing. After that period the location would be considered open to any other fishermen.

Markley had made preparations before May 28 to set and operate his nets in the area in question, but at six o'clock in the morning of May 28 the tide was virtually at low water and it was difficult to place the nets by dragging them over the mud flats as that involved considerable labor. Normally in such cases the nets are set as the tide comes in and when there is sufficient water to operate a dory containing the nets and floats over the submerged mud flats. Markley on this particular morning was busy elsewhere but had everything ready to set his nets as soon as the tide came in.

However, the plaintiff did not wait for the tide. Evidently financed and acting under the directions of a local fish packing company referred to as General Fish Company, which provided the gear and equipment, the plaintiff at the hour of six o'clock a. m. commenced the setting of his nets, by use of a boat dragged over the mud flats where the water was about two inches deep, and by use of a sled farther up on the beach where no water at all could be found, and shortly thereafter completed the placing and setting of his nets in the general area which Markley intended to use for his nets and which he had used in previous years. The plaintiff placed one of his nets, not at right angles to the tide current but parallel therewith. This method of setting was described as a "fore and aft" set. It seems certain that any net so set would not catch as many salmon as a net set in the orthodox fashion, and therefore, it is reasonable to conclude that the plaintiff set his net in this manner in order to occupy as much territory as possible and to destroy the chances of the defendant's being able to set a net in that vicinity, because the regulations require that no part of any net may be within 600 feet of any part of another net. The plaintiff by staking his net fore and aft of the

tide compelled other fishermen to set their nets correspondingly farther away.

By the time the tide came in so that Markley could set his nets it was nine o'clock in the morning and the plaintiff's nets had been established nearly three hours. Markley, however, discovered that the plaintiff's initials did not appear on the clusters of floats marking the ends of the nets and, therefore, concluded that the set of plaintiff's nets was not complete and, therefore, that plaintiff's nets were not nets within the meaning of the laws and regulations and, therefore, that the defendant himself might establish his nets without regard to the setting of plaintiff's nets in their "incomplete" condition.

The plaintiff appeared in court promptly thereafter and sought and obtained an injunction pendente lite against the defendant from operating the defendant's nets. While the fishing season for 1951 has long since expired, the question still remains for determination as to which of the nets, the plaintiff's or defendant's, are the legal nets, and if the defendant should prevail then he would necessarily be entitled to damages for what would then be a wrongful injunction.

Under what I believe to be the uniform current of authority on the subject, the last case being that of Fisher v. Everett, decided in 1945, 66 F.Supp. 540, 11 Alaska 1, it has been held that with respect to the operation of fish traps and set nets in Alaska waters, the first in time is generally prior in right. The subject was discussed at length by the writer of this opinion in the Fisher case and no good end would be accomplished in repeating what was there said. In that opinion the several cases bearing intimately upon the subject were cited and some of them were given detailed consideration, particularly the case of Canoe Pass Packing Co. v. United States, 9 Cir., 270 F. 533, 5 Alaska Fed. 25.

The defendant urges strongly upon the Court that the plaintiff's net was not complete when the defendant set his net in the immediate vicinity of plaintiff's net. That argument is based upon the Regulations, Sec. 109.8, those Regulations having

the force and effect of law. The section reads as follows:

"Marking of gill nets. Each gill net in operation shall be marked by a cluster of bright red floats or corks at the ends, and bright red double floats or corks shall be attached to the cork line at 25-fathom intervals. The clusters at the ends shall also be legibly and plainly marked with the initials of the operator. In addition, each end of a set or anchored gill net shall be marked by a buoy of wood or metal of sufficient buoyancy to float in plain view at all times. Each buoy shall be legibly and plainly marked with the name or initials of the operator and the number of the boat used in the operation of the net to which it is attached, said lettering and numbering to consist of black figures and letters not less than 6 inches in length, painted on white background."

Only one sentence of the section is here particularly relevant, and that is:

"The clusters at the ends shall also be legibly and plainly marked with the initials of the operator."

The plaintiff testified that when his net was set shortly after six o'clock on the morning of May 28, 1951, the clusters at the ends were in fact legibly and plainly marked with his initials. Plaintiff testified that adhesive tape was used in attaching the markings. The defendant and two other witnesses equally firmly testified that they saw the plaintiff's net shortly after it was set and that there were no initials whatever upon the clusters at the ends, either those of the plaintiff or of any other person. There was testimony that initials were seen on the plaintiff's net but that was sometime later and long after the defendant had set his net in the vicinity.

The plaintiff as a witness was lacking in the signs usually associated with credibility. He was hesitant and evasive upon matters susceptible of plain and straightforward answers. Moreover, he had theretofore pretended that in setting and operating this net he was operating for himself whereas in the end by his own

testimony it appeared that he had no interest in the net whatever except as the employee or the agent of another. My conclusion is, that when the plaintiff first set his net and thereafter until at least the defendant's net had been set, the plaintiff's net did not bear his initials.

 Now the question is whether the lack of initials on the plaintiff's net made it in effect and in law no net at all, so that when the defendant set his net he could safely disregard the plaintiff's net although only a short distance away and within the prohibited area. To arrive at the answer we must consider the reason for requiring that the initials be placed upon the clusters at the ends of each net. It is common knowledge that the reason is to facilitate policing the nets. That policing is in part done by airplanes operated by the Fish and Wildlife Service. With the net so marked it is easy for the inspecting officers to determine the identity of the operators of each net. The same is, of course, true as respects the inspection that takes place from motor boats. The initials give the identity of the operator and facilitates the enforcement of the law with respect to the operations of the various nets on the shores of Cook Inlet. It would, I think, be going too far to say that a set net, lacking the initials only— and this seems to have been the only defect in the net—is not a set net in contemplation of law; and that any other person may disregard that net as though not existing and place another net within the prohibited distance of it. To announce that doctrine might well result in conflict and disorder. I therefore find that the plaintiff set and established his net on the morning of May 28, 1951, before the defendant set and established his net and that the plaintiff has priority in that respect.

The effect of above mentioned custom remains to be considered. It seems certain beyond doubt that the plaintiff and his employer or principal knew of the custom and decided to disregard it. The fact that the defendant would be deprived of his livelihood made no difference to them. Analogy was made in the argument of the Fisher case to the effect of custom and to the "jumping" of mining claims, but I am of the opinion that the same rule cannot apply here to fishing locations for the reasons mentioned in the opinion in the Fisher case. It is true that the Court of Appeals for the Ninth Circuit in the Canoe Pass case did not pass upon the effect of custom because in that instance no custom had become established.

In this litigation it appears that the defendant had what he conceived to be a right or privilege which might be held by him as long as he exercised it. The plaintiff and his principal or employer determined to take it away from the defendant and they have succeeded in doing so. The moral aspects of the case cannot enter into the decision. The Court is bound to enforce the law as it stands no matter who may be injured or what may be the respective property status of the parties.

The injunction was rightly granted but is no longer in force. The decision here made, except as to general principles of law, has no bearing on any fishing operations that may be carried on in the area mentioned in the year 1952. No damages should be awarded. Each party herein will bear his own costs.