**ALEUT COMMUNITY OF ST. PAUL ISLAND**

v.

**UNITED STATES.**

No. 427-52.

United States Court of Claims.

Jan. 5, 1954.

Marvin J. Sonosky, Washington, D. C., for plaintiff. King, Noble & Sonosky, Washington, D. C., were on the brief.

Ralph A. Barney, Oklahoma City, Okl. with whom was Perry W. Morton, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

WHITAKER, Judge.

This case is before us on defendant's motion to dismiss plaintiff's petition.

The petition alleges that plaintiff is a band of American Indians on St. Paul Island, which is one of the Pribilof Islands (located about 350 miles off the west coast of Alaska in the Bering Sea); that it had exclusively occupied this island since long before the acquisition of Alaska by the United States from Russia, during all of which time it had enjoyed the exclusive right to catch seals in the waters around the island, from which it derived its food and clothing, and which it used in the making of boats for its own use, and any surplus in whicl., beyond its own needs, it sold. It is alleged that the hunting, killing and skin-

ning of seals is a "community enterprise and not the undertaking of individual members," and that it was their only means of livelihood.

Since the acquisition of Alaska by the United States in 1867, plaintiff alleges that its rights have been consistently disregarded, that its members have been deprived of their right "to sell their labor and the products of their labor as they pleased, * * * to leave the island and return to it at will * * *"; and that, particularly since August 13, 1946 [1] "the defendant has not permitted petitioner to sell its raw seal furs in competition on the open market, but has required petitioner to sell its furs to defendant exclusively, at prices fixed by defendant shockingly below the fair market price of the raw seal furs." Therefore, plaintiff alleges it has been deprived of its property without just compensation.

Defendant interposes a number of defenses. First, it says plaintiff is not an identifiable group of American Indians, and, therefore, has no capacity to sue; second, it says the petition does not state a cause of action, for a number of reasons: (1) it says that whatever rights plaintiff may have had were extinguished by the treaty of 1867 between the United States and Russia, March 30, 1867, 15 Stat. 539; (2) the petition does not show that the defendant has violated any right secured to plaintiff by the Constitution or by any law or treaty, because neither plaintiff nor any one else had any rights to seals in their wild state, nor could they have the exclusive right to hunt or to kill them.

The petition does not allege that plaintiff has been dispossessed of its occupancy of St. Paul Island. It is true that the Resolution of March 3, 1869, 15 Stat. 348, made it unlawful for any person to land or remain on the island except by the authority of the Secretary of the Treasury. Evidently, however, the natives were not dispossessed under this Act, for on July 1, 1870, Congress passed an act, 16 Stat. 180, prohibiting the killing of seals on the island or in the waters adjacent thereto except in the months of June, July, September and October, but with the following proviso:

"That the natives of said islands shall have the privilege of killing such young seals as may be necessary for their own food and clothing during other months, and also such old seals as may be required for their own clothing and for the manufacture of boats for their own use, which killing shall be limited and controlled by such regulations as shall be prescribed by the Secretary of the Treasury." § 1.

Apparently plaintiff was not dispossessed of its lands, if any, under the Act of 1869, supra, and has not been since.

If it has any complaint, it is because of defendant's interference with its former practice of hunting and killing seals and selling their furs. This has been done pursuant to the following acts:

By the Act of July 27, 1868, 15 Stat. 240, 241, Congress made it "unlawful for any person or persons to kill any otter, mink, marten, sable, or fur seal, or other fur-bearing animal, within the limits of said territory [the territory ceded by Russia, which includes St. Paul Island], or in the waters thereof".

Later, by the Act of March 3, 1869, 15 Stat. 348, Congress made the islands of St. Paul and St. George a special reservation for Government purposes. Following this, on Juy 1, 1870, 16 Stat. 180, Congress made it unlawful to kill any fur seal on the islands of St. Paul and St. George, except during the months of June, July, September and October, with the proviso set out above, reserving to the natives the right to kill seals in other months for food, clothing and for use in the making of small boats. The total number of fur seals which might be

---

1. The date of August 13, 1946, is significant only to show jurisdiction in this court. This court has original jurisdiction only of those Indian claims that arise after this date; all others must be brought in the first instance in the Indian Claims Commission.

killed in any one year on the island of St. Paul was limited to 75,000, and on St. George to 25,000, with the right in the Secretary of the Treasury to further limit the killing of fur seals, if necessary, for the preservation of seals on these islands.

By the fourth section of the Act of July 1, 1870, the Secretary of the Treasury was directed to lease for a period of 20 years the right to engage in the business of taking fur seals on the island of St. Paul to proper and responsible parties, "having due regard to the interests of the government, the native inhabitants, the parties heretofore engaged in trade, and the protection of the seal fisheries". It was further provided that in making the lease, the Secretary of the Treasury was directed to "have due regard to the preservation of the seal fur-trade of said islands, and the comfort, maintenance, and education of the natives thereof." At the expiration of the 20-year term of the lease, the Secretary was directed to negotiate another lease for an equal length of time.

When these leases expired Congress, by the Act of April 21, 1910, 36 Stat. 326, took unto itself the exclusive right to kill seals in these islands and to sell their skins. Under this Act the right to kill seals could be exercised only "by officers, agents, or employees of the United States appointed by the Secretary of Commerce and Labor, and by the natives of the Pribilof Islands under the direction and supervision of such officers, agents, or employees, and by no other person * * *." The seal skins were to be sold by the Secretary of Commerce and Labor, and the proceeds of the sales were to be paid into the Treasury of the United States.

By section 3 it was required that the native inhabitants should be used in hunting and killing the seals and curing the skins, and it was provided that they should receive for their labor "fair compensation," to be paid to them, or to be expended for their benefit as the Secretary of Commerce and Labor might direct. All other persons were prohibited from killing fur seals or other fur-bearing animals, except under authorization of the Secretary of Commerce and Labor.

By section 2 of the Act of February 26, 1944, 58 Stat. 100, 16 U.S.C.A. § 631a et seq., it was made unlawful for any person owing the duty of obedience to the laws of the United States to engage in sealing in the North Pacific Ocean, or to sell or have in his possession any seal skins, but by section 3 of the Act Indians, Aleuts, or other aborigines on the coast of America were permitted to carry on pelagic sealing without the use of firearms from canoes wholly propelled by paddles, oars, or sails, "in the way heretofore practiced by said Indians, Aleuts, or other aborigines, and shall be permitted to dispose of the skins of fur seals or sea otters so taken as they see fit, but only after such skins have been officially marked and certified as provided in section 2 of this Act. * * * ".

By section 4 of the Act the Secretary of the Interior was authorized to permit officers and employees of the United States and natives of the Territory of Alaska to engage in sealing on the Pribilof Islands, and also to permit pelagic sealing under certain circumstances. This, however, was to be done for the benefit of the United States, for by section 5 of the Act it was required that the skins of all seals taken under authority of the Act "shall be sold under the direction of the Secretary in such market, at such times, and in such manner as he may deem most advantageous; and the proceeds of such sale shall be paid into the Treasury of the United States."

By section 6 the Pribilof Islands and others were continued as a special reservation for Government purposes; and by section 7 the provision requiring the employment of the native inhabitants of the islands for the killing of the seals and the curing of their skins was continued.

By section 8 the Secretary of the Interior was authorized to furnish the native inhabitants of these islands with

food, shelter, fuel, clothing and other necessities of life, and to provide for their comfort, maintenance, education, and protection.

The sum total of all these Acts, so far as material here, is that a long time prior to August 13, 1946, the Government had monopolized the fur-seal industry on the Pribilof Islands, and permitted sealing by the natives only under regulations prescribed by the Secretary of the Interior, and for the benefit of the United States, and with the requirement that the proceeds of sales should be deposited in the Treasury of the United States.

By these Acts, culminating in the Act of February 26, 1944, supra, Congress took whatever rights plaintiff may have had to hunt and kill seals on St. Paul Island or in its surrounding waters. Defendant, however, says that plaintiff did not have and could not have had any property right to hunt and kill seals at this place, or at any other place, and that whatever right it had to do so was subject to regulation and control by Congress.

■ It will be observed that the purpose of all these Acts is the protection of the sealing industry and its proper regulation, in order, among other things, to prevent extermination of the herds, to preserve these islands as breeding grounds, and to prevent the flooding of the market with skins. There is no doubt that such regulations are within the police power of the Federal Government in dealing with territories.

In Geer v. State of Connecticut, 161 U.S. 519, 522, 16 S.Ct. 600, 602, 40 L.Ed. 793, the Supreme Court, in an opinion by Chief Justice White, then an associate justice, said:

> "From the earliest traditions, the right to reduce animals *feræ naturæ* to possession has been subject to the control of the law-giving power."

In that opinion Justice White discussed at length the rights of citizens in wild game. The substance of his discussion is that no private citizen or group of private citizens has any property right in wild game to the exclusion of other citizens, but that they have the right to reduce it to possession, but no greater right to do so than other citizens, and that this right is subject to the undoubted power of the sovereign to regulate it or to absolutely control or forbid it.

■ This is true, he says, not only at common law, but under the civil law, and, indeed, was true under the law of Greece and Rome. He quotes at length from Pothier's Treatise on Property, expounding the civil law, and from Blackstone and Kent in exposition of the common law, and he also quotes from or cites decisions of the Supreme Court of the United States and of various State courts. 161 U.S. on page 529, 16 S.Ct. on page 604, 40 L.Ed. 793, he quotes with approval the following from Ex parte Maier, 103 Cal. 476, 37 P. 402:

> "'The wild game within a state belongs to the people in their collective sovereign capacity. It is not the subject of private ownership, except in so far as the people may elect to make it so; and they may, if they see fit, absolutely prohibit the taking of it, or traffic and commerce in it, if it is deemed necessary for the protection or preservation of the public good.'"

This rule of law has never been questioned. The Geer case has been cited by the Supreme Court many, many times.

■ Whether this was the law of Russia at the time we acquired the Territory of Alaska, we do not know; but whether it was or not, when the territory was acquired by the United States the ownership or rights in property in that territory became subject to the exercise of the sovereign powers of the United States. Among these sovereign powers is the right to regulate and control or to prohibit the taking of wild game. Whatever rights the Aleuts had to take seals in the waters off St. Paul Island under Russian dominion, there can be no doubt

that upon acquisition of that territory by the United States their right to do so was subject to the paramount power of the United States to regulate and control it.

It was, therefore, lawful for the United States to lease these grounds under the authority conferred by the Act of July 1, 1870, and it was lawful for it to assert unto itself a monopoly in the industry, as authorized by the Acts of 1910 and 1944, supra. Under those Acts it was lawful for the United States to regulate and control the right of plaintiff to engage in sealing, and the Government also had the right to exclusively operate the sealing industry in this locality, if it chose to do so, because seals in their wild state belong "to the people in their collective sovereign capacity * * *."

■ Plaintiff's petition alleges that in the regulation of the sealing industry the individual members of the plaintiff community were deprived of their right "to sell their labor and the products of their labor as they pleased." This allegation is contrary to the provisions of the various Acts set out above, and, therefore, it is not to be taken as true on a motion to dismiss. The Acts provide that in the hunting, killing, and skinning of the seals native labor shall be employed, but there was no requirement that they should accept such employment, if they did not wish to do so; nor was there any requirement that they should work at any wage other than what would be "fair compensation."

Plaintiff's petition also alleges that the defendant has not "permitted petitioner to sell its raw seal furs in competition on the open market." This is true. But the remainder of the allegation is in contradiction to the Act cited above. The remainder of the allegation reads:

> " * * * but has required the petitioner to sell its furs to the defendant exclusively, at prices fixed by the defendant shockingly below the fair market value of the raw seal furs * * *."

This allegation is not true because under the Act of 1910 the Government asserted a monopoly in this industry and this monopoly was continued by the Act of 1944; so that plaintiff had no right thereafter to kill seals for the purpose of selling their skins on the open market. Under these Acts, the only right plaintiff had to kill seals was the right to kill them for food and clothing and for use in the manufacture of small boats, and for the benefit of the United States. The Government had the right to altogether prohibit plaintiff from engaging in sealing and, hence, had the right to permit it to do so only on the conditions imposed. When plaintiff killed seals it killed them for the benefit of the United States and with knowledge that the United States would sell the skins and put the proceeds of sale in its own treasury. Seals killed by the natives were Government seals.

We have not considered defendant's other defenses, to wit, that whatever rights plaintiff had were extinguished by the treaty of 1867, and that plaintiff was not an identifiable group of American Indians. We have not done so because we think that what we have said above disposes of the case.

Defendant's motion to dismiss is granted; plaintiff's petition is dismissed.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.