The UINTAH AND WHITE RIVER BANDS OF UTE INDIANS

v.

The UNITED STATES.

No. 47569.

United States Court of Claims

June 5, 1957.

As Amended Oct. 9, 1957.

954

Carl S. Hawkins, Washington, D. C., for plaintiffs. Ernest L. Wilkinson, F. M. Goodwin, Wilkinson, Cragun, Barker & Hawkins, Washington, D. C., were on the briefs.

Floyd L. France, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

This is a suit against the United States by the Uintah and White River Bands of Ute Indians. They assert, and the Government denies, that this court has jurisdiction of the case under the special Ute Jurisdictional Act of June 28, 1938, as amended.[1] By section 1 of that Act this court is authorized to "hear, determine, and render final judgment on all legal and equitable claims of whatsoever nature which the Ute Indians or any tribe or band or any constituent band thereof, may have against the United States, including, * * * claims arising under or growing out of any treaty or agreement of the United States, law of Congress, executive order, or by reason of any lands taken from them, without compensation."

The plaintiffs claim just compensation for 973,777 acres of the former Uintah Indian Reservation in Utah, taken by the United States on July 14, 1905, by incorporation into the Uintah National Forest. The questions now ready for decision are whether the plaintiffs were the owners of the land at the time in question; if they were, what was the value of the land at the time it was taken; and are they entitled to interest on that value.

The Plaintiffs' Title

By an Executive Order of October 3, 1861, 1 Kappler p. 900, President Lincoln approved a recommendation of the Secretary of the Interior that "the Uintah Valley, in the Territory of Utah, be set apart and reserved for the use and occupancy of Indian Tribes". The lands involved in this case lie within the area described in the Executive Order.

The Act of May 5, 1864, 13 Stat. 63, authorized and required the Superintendent of Indian Affairs to bring together and settle in the Uintah Valley as many of the Indians of Utah Territory as might be found practicable. It said that the Uintah Valley

"is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same."

Pursuant to an Act of February 23, 1865, 13 Stat. 432, a treaty was negotiated with numerous Indian tribes in Utah providing for their surrender of all their rights in land in that territory which was suitable for agricultural and mineral purposes, but reserving to the Indians for their exclusive use and occupation "the entire valley of the Uintah River within Utah Territory".

Although the treaty just described was never ratified, various individual Indians and groups of Utah Indians, from time to time after 1865, moved into the Uintah Valley. An Indian Agency was estab-

[1.] The Ute Jurisdictional Act of June 28, 1938, c. 776 (52 Stat. 1209), as amended by the Act of July 15, 1941, c. 299 (55 Stat. 593); June 22, 1943 (57 Stat. 160); June 11, 1946, c. 378 (60 Stat. 255); and Sections 1, 2, 11 and 25 of the Act of August 13, 1946, c. 959 (60 Stat. 1049), 25 U.S.C.A. §§ 70, 70a, 70j, 70 note.

lished there, the area became known as the Uintah Indian Reservation, and the Indians so migrating into the reservation, as well as those already there before the reservation was established, and their descendants, became and have since been known as the Uintah Indians or Uintah Ute Indians, one of the plaintiffs herein.

In 1868, 15 Stat. 619, a treaty was made with seven bands of Ute Indians, sometimes thereafter known as "The Confederated Bands of Ute Indians". This treaty was later duly ratified. It set apart a large reservation, wholly within the Territory of Colorado, for the Indians named in the treaty and for such other friendly Indians as they might be willing to admit among them. The Indians relinquished all claims and rights to land not included within the reservation.

In an agreement embodied in the Act of June 15, 1880, 21 Stat. 199, with the Confederated Bands of Ute Indians in Colorado, the Indians ceded the then remaining portions of their Colorado reservation and the various bands agreed to settle in other places designated in the agreement. Of interest in this case were the provisions that the White River Utes agreed to remove to the Uintah Reservation in Utah and the Uncompahgre Utes agreed to remove to an area on the Grand River, in Colorado, or to other lands in that vicinity and in Utah. The White River Utes then moved to the Uintah Reservation in Utah, and their descendants have continued to live on that reservation. This band and the Uintah band are the plaintiffs in this case. The Uncompahgre Utes were settled upon a reservation in Utah which was not within the area of the Uintah Reservation.

Thus far, on the question of title, we have the 1864 Act setting apart the Uintah Reservation

"for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory (Utah) as may be induced to inhabit the same."

We have Indians who were already in the area and others of different Utah bands moving into the area and settling there, apparently losing their identity and becoming known as "Uintah Ute" Indians. It could well be urged that these Indians, having fulfilled the conditions of the statute, became the grantees, or at least "recognizees" under the statute. It is as if one made a deed "to the first of my grandsons who shall reach the age of 25".

The Indian Claims Commission, on February 21, 1957, in the case of The Uintah Ute Indians of Utah v. United States, Docket No. 45, held that the United States is liable to the Uintah Ute Indians for the undivided share of the reservation which the United States turned over to the White River Utes pursuant to the 1880 statute.

The Act of May 24, 1888, 25 Stat. 157, provided that a designated portion of the Uintah Valley Reservation should be restored to the public domain and sold if three-fourths of the adult male Indians residing on the reservation consented. The statute provided:

"That all moneys arising from the sales of this land shall belong to said Indians and be paid into the Treasury of the United States and held or added to any trust funds of said tribes now there."

In the administration of this Act, the consent of the Uintah and the White River Indians was obtained, the lands were sold, and the receipts were credited to these two bands of Indians. In 1902, Congress appropriated $10,000 more to these Indians for other lands detached from the reservation pursuant to the 1888 statute.

Bills were introduced in Congress in 1893 proposing that the Uncompahgre Indians be allotted lands in the Uintah Reservation. The Secretary of the Interior and the Commissioner of Indian Affairs, being asked to comment on the bills, opposed the bills on the ground that the Indians residing on the Uintah Reservation owned the land, and that it should not be taken from them except by negotiation and purchase. The bills were not passed.

In finding 14 we recite administrative actions taken in 1892, 1897, and 1898 on the express assumption that the Uintah and White River Utes owned the land in the Uintah Reservation. Pursuant to statutes cited in our findings 15, 16, and 17, some Uncompahgre Indians were given allotments in severalty in the Uintah Reservation, and the Uintah and White River Utes were paid $60,064.48 for the lands so allotted.

By the Act of May 27, 1902, 32 Stat. 245, 263, the Secretary of the Interior was directed, if a majority of the adult male Indians of the Uintah and White River Bands consented, to make individual allotments to the Indians and then restore all of the unallotted lands of the Uintah Reservation to the public domain, to be sold under the homestead law for $1.25 an acre, the proceeds to be used for the benefit of said Indians. The allotments were made, and sales of the lands restored to the public domain ultimately produced proceeds of $1,184,-996.33 which were placed in an account headed "Proceeds of Uintah and White River Ute Lands".

Our finding 19 shows that later in 1902, and before the allotments had been made and the unallotted lands restored to the public domain, Congress directed the Secretary of the Interior to set apart for the Indians a common grazing area in the reservation. The statute seems to have reduced the allotments of the Uncompahgre Indians, but gave them rights in the common grazing area.

By the Act of March 3, 1905, 33 Stat. 1048, 1069–1070, Congress, among other things, authorized the President to set apart and reserve, as an addition to the Uintah Forest Reserve, such portions of the lands within the Uintah Indian Reservation as he considered necessary. The President, on July 14, 1905, 34 Stat. Pt. III, 3116, set aside 1,010,000 acres of land under this authority. This land was, of course, a part of the land which, under the Act of May 27, 1902, was to have been restored to the public domain, sold, and the proceeds used for the benefit of the Uintah and White River Indians. No provision was made for paying the Indians for the 1,010,000 acres of land, and they are now suing for its value.

In this opinion we have abbreviated the history of the dealings of Congress and the Executive with these Indians in relation to this land. A much fuller history appears in our findings. It plainly appears from it, we think, that Congress in its statutes, and the Executive in interpreting those statutes, repeatedly recognized the plaintiff bands as the owners of the Uintah Reservation. They were the ones whose consent had to be obtained, when transactions relating to the land were contemplated. They were the ones to whom the money was to be paid and was paid, when reservation land was disposed of to third persons.

Between 1924 and 1929 several unsuccessful attempts were made to obtain passage of special jurisdictional acts to permit the plaintiff bands to sue in this court for the taking of the 1,010,000 acres of land. In 1930 a bill was introduced providing for a direct payment for the lands, at the rate of $1.25 per acre. In this bill, for the first time, the Uncompahgre Band of Utes was included with the Uintah and White River Bands. The committee report and material inserted in the Congressional Record discussed only the title of the Uintah and White River Bands. There is no explanation or mention of a reason for including the Uncompahgre in the bill.

The bill was enacted on February 13, 1931, 46 Stat. 1092, and provided for the direct payment of $1,217,221.25 for 973,777 acres of land, which was at the rate of $1.25 per acre. The bill said that the payment was to be in full satisfaction of all claims of the Indians in relation to the 973,777 acres of land. The remainder of the land, 36,223 acres, was said to be coal land, and action on it was reserved. The appropriated money was distributed per capita to the three bands of Indians, the Uncompahgre receiving $439,466.88 of it. The coal lands

are the subject of another suit now pending in this court.

### The Jurisdictional Act

■ The jurisdictional act, cited supra, gives the court jurisdiction to decide the plaintiffs' claims arising "by reason of any lands taken from them without compensation." Section 1. The Government points to the payment made under the 1931 Act and says that these lands were not taken without compensation. We have no doubt that the Jurisdictional Act was intended to include these claims. The pertinent committee reports say so in express words. House Rept.No.1028, 75th Cong., 1st sess., on HR 3162, pp. 2–3; Senate Rept.No.1219, 75th Cong., 1st sess., pp. 2–3. And section 5 of the Jurisdictional Act itself provides that payments made by the United States upon or in satisfaction of any claim sued on under the Act should not operate as an estoppel, but only as a setoff against the claim. Our conclusion is that the court has jurisdiction of the claim.

### The Value of the Land

■ The land was taken in 1905, and must be valued as of that date. The valuation of an area of land such as the one here involved, as of today, would be a task of great difficulty, and the figure arrived at would be, at best, an approximation, reached by weighing a large number of elements of greater or lesser significance, and giving each the weight which it was thought to merit. In the instant case, the relevant events and elements are those of fifty years ago. Highly competent experts were presented by the parties. But they disagreed as to whether 1905 was an unusually dry season, or on the other extreme, was a year of record-breaking rainfall; whether the edible plant growth was more abundant in 1905 than now, because it had been overgrazed during World War I, or the management of the Forest Service had so improved it that it is better now than it ever was; whether in 1905, small tracts of this kind of land brought higher prices per acre than large ones,

or *vice versa*. Thus there was disagreement, even as to relevant historical facts. There was disagreement as to conclusions to be drawn even from undisputed historical facts, such as the prices at which the railroads in the area sold their alternate sections of land. Did they sell them cheap in order to settle the country and get in cash to retire their bonds, or did they hold out for about the market price? There was disagreement as to how far from the area in question land transactions might take place, and still be helpful in arriving at the market value of these lands. Many lay witnesses were presented by the plaintiffs, old residents who recollected, more or less accurately, events and transactions of the time in question.

Commissioner Hogenson of this court presided over the lengthy trial and has made an able and obviously careful report. He had a better opportunity than we have to acquire a realistic understanding of the problem of the value of these lands as of 1905, and we think his conclusion is substantially right. We therefore find, as he did, that the value was $1.25 per acre.

### The Payment to the Uncompahgres

■ As we have seen, the 1931 Act required the payment of a share of the money granted by that act to the Uncompahgre Indians, and $439,466.88 of the money was paid to them. They had no title or interest in the Uintah Reservation except in the allotments which were bought for them from the plaintiffs, and in the common grazing area. They had, therefore, no interest in the 973,777 acres of the land placed in the Forest Reserve, for which the 1931 payment was made. The United States is entitled to no credit for the $439,466.88 which was paid to the Uncompahgre Indians. It is entitled to credit for the $777,754.37 which was paid to the plaintiffs.

### Interest

■ The parties disagree as to whether our judgment should include interest upon the sum which we find to be the 1905 value of the land in question. As

we have said, the plaintiffs were the owners of the land in question, with a title repeatedly recognized by Acts of Congress, and by Executive actions taken pursuant to statutes. The United States, pursuant to an Act of Congress, took possession and ownership of the land for itself for its Forest Reserve. No plainer case of an expropriation could be stated. In that respect the case is like United States v. Creek Nation, 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 and Shoshone Tribe of Indians of Wind River Reservation in Wyoming v. United States, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360. It was held in those cases that in the case of an expropriation of lands owned by Indian Tribes, interest from the time of the taking must be included as a part of just compensation, in order to satisfy the Fifth Amendment. The decision in United States v. Alcea Band of Tillamooks, 341 U.S. 48, 71 S.Ct. 552, 95 L.Ed. 738, was based on the Court's conclusion that no taking such as is contemplated by the Fifth Amendment occurred in that case.

If the plaintiffs were not, as we think they are, entitled to interest as a constitutional right, we think they would be entitled to interest under the provisions of the Jurisdictional Act. If Congress did not intend that the measure of recovery constitutionally required in expropriation cases should be applied, there was no reason for its express statement in section 6 that, if it found that the plaintiffs' lands had been taken without compensation,

> "the court shall render judgment in favor of said Indians, and shall award to them, as for a taking under the power of eminent domain, compensation for all such lands * * *."

■ An interesting question arises as to the effect of the payment of the $777,-754.37 by the United States to the plaintiffs in 1931 on the computation of interest. If it is applied to reduce the principal, it would follow that no interest on that part of the principal would accrue after 1931. If it is applied on the interest accrued up to 1931, it is not enough to pay that interest, and would leave all of the principal continuing to draw interest since 1931.

The plaintiffs say that a payment not large enough to pay both interest and principal is to be applied first to interest, citing Story v. Livingston, 13 Pet. 359, 371, 38 U.S. 359, 371, 10 L.Ed. 200. The Government says that this is the rule unless the debtor, when he makes his payment, stipulates that it is to be applied to principal. The authorities cited by the Government seem to relate not to the question of principal and interest, but to situations where the debtor owes the creditor more than one debt, and stipulates that his payment should, for example, be applied to a secured debt, when the creditor would prefer to apply it to an unsecured debt.

However, although there seems to be no precedent, we think that the general rule should be that the debtor may effectively direct the application of his payment. If he makes a payment stipulating that it shall be applied to principal, it would seem that the creditor would have no right to retain the payment and apply it to interest. If the interest is overdue, he may collect it by suit, but he can't do it by self-help, by using for a purpose which he prefers, money which is put into his hands for another purpose.

If the intention of the debtor were controlling in the instant case, we have no doubt about the intention of Congress in 1931. It said that its payment was to be in full satisfaction of all claims relating to the land, and it fixed a price of $1.25 per acre for the land. It was thinking of principal, not interest.

The plaintiffs urge that the Jurisdictional Act has directed us how to apply the 1931 payment by saying, in section 5

> "No payment or payments which have been made by the United States upon or in satisfaction of any claim or claims asserted in any suit brought hereunder * * * shall apply as an estoppel against any suit brought hereunder, but there

shall be set off against any recovery * * * any payment made * * *."

The plaintiffs say that this language directs us to compute their recovery as if no payment had been made in 1931, and then set off the 1931 payment against the result of that computation. This is a fair argument, and we are by no means certain that it is not correct. We conclude, however, that it was not meant by Congress as a specific direction as to how the computation should be made, but only as an assurance that the claims were not to be barred completely by a prior payment purportedly made in full satisfaction. We think Congress left to the Court the details of the computation, and expected us to make it in the same way that such a computation would be made in private litigation.

We do not adopt the proposal of either litigant. As to the Government's contention as to the application of the 1931 payment, we think that in the instant situation the intention of the debtor is not controlling. The "debt" is not an obligation incurred by agreement, but one imposed by the law of the Constitution. Our duty, we think, is to apply the 1931 payment in such a way as to most nearly approach the Constitutional objective of compensation for the value at the time of taking, plus compensation, in the form of interest, for delay in paying for the value at the time of taking.

When the $777,754.37 was paid to the plaintiffs in 1931, 26 years of interest at 5% had accrued upon the 1905 value of the land. The $777,754.37 was, therefore, sufficient to pay principal (100%) plus accrued interest (130%) upon only $338,154.08 of the principal ($777,754.37 ÷ 2.30 = $338,154.08). We think it should be so applied. That means that as to that much of the principal, the payment was in full, and no further interest accrued. As to the balance of the principal, $879,067.17, no payment has ever been made, and that sum draws interest from 1905 to the date of payment.

We realize, of course, that such a formula, attempted to be patterned to fit a situation as unusual as the instant one where the Constitutional obligation has remained unfulfilled for more than fifty years, has rather rough edges. But it seems fairer to us than those proposed by the parties.

The plaintiffs are entitled to recover $879,067.17, with interest thereon, as a part of just compensation at 5% from July 14, 1905 to July 14, 1934, and at 4% from the latter date to the date of payment.[2] The question of the remaining offsets, if any, has not been determined, and the case will be remanded to the commissioner for further proceedings on that matter under Rule 38(c), 28 U.S.C.A.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.

2. See Alcea Band of Tillamooks v. United States, 87 F.Supp. 938, 115 Ct.Cl. 463; Rogue River Tribe of Indians v. United States, 89 F.Supp. 798, 116 Ct.Cl. 454, certiorari denied 341 U.S. 902, 71 S.Ct. 610, 95 L.Ed. 1342.