Laeamoee, Judge,
delivered the opinion of the court:
The Act of June 19,1935,49 Stat. 388, ch. 275 (as amended by Act of June 5,1942, 56 Stat. 323, and Act of June 4,1945, 59 Stat. 231) gave this court jurisdiction to adjudicate all claims which the Tlingit and Haida Indians may have against the United' States, including compensation owed both for land and other tribal property rights in southeastern Alaska expropriated by the United States and for the failure of, and refusal by, the United States to protect those property rights from usurpation by non-Indians.
By our decision of October 7, 1959 (Tlingit and Haida Indians of Alasha v. United States, 147 Ct. Cl. 315, 177 F. Supp. 452) we held that the Indians, as a tribe, had established aboriginal Indian title to six designated areas on the Alaskan Archipelago by their exclusive use and occupancy of that territory from time immemorial. In redress for the uncompensated and uncontested taking by the United States, equitable and just compensation, as provided for in the Act, was held owed to the Tlingit and Haida tribes. The court remanded the case for further proceedings to determine the amount of recovery, the existence and amount of any offsets available to the United States, and whether or not the Indians had1 voluntarily abandoned any of their land prior to the date of taking by the United States.
Trial Commissioner Saul R. Gamer, in his report filed September 12, 1966, concluded that none of the land had been abandoned prior to the taking date and that no offsets are available to the United States. In addition, he awarded damages in an amount determined by two alternative meth *134 ods of measurement; first, the fair market value on the date of taking, $15,984,368.80 and second, the value to the Indians, as aboriginals, for their own subsistence, $1,281,200.
Both parties except to these findings of fact and by brief and oral argument contest both the proper valuation standard and the application of that standard to the instant facts. We adopt the fair market value standard of valuation and, in part, the application of that standard by the commissioner. First, we will discuss the threshold issue of a correct standard for valuation and, subsequently, the application of that standard to fishing sites, townsite locations, and mineral and forest land areas.[1]
I
Our 1959 decision developed the factual background of this case in detail and only a brief review of the development of this litigation is appropriate. It involves valuing six separate areas of over 17,500,000 acres, each area having a different valuation date ranging from 1891 to 1925, different resources, and numerous land parcels patented over a 50-year period. Over a hundred different mining properties, some 10,700,000 acres of forest land, land in several townsite areas and fishing right valuations produced voluminous appraisal reports and extensive expert testimony. The critical dates of taking, as of which a valuation must be determined, were stipulated to have occurred as follows: The Annette Islands, 86,730 acres, by the Act of March 3, 1891 (26 Stat. 1095); 14,956,312 acres in Tongass National Forest taken by Executive Proclamations of August 20, 1902 (32 Stat. 2025), September 10, 1907 (35 Stat. 2152) and February 16, 1909 (35 Stat. 2226) (except parcels patented prior to those dates), issued pursuant to the Act of March 3, 1891, swpra; and 2,558,246 acres set aside as the Glacier Bay National Monument by Presidential Proclamations of February 26, 1925 (43 Stat. 1988) and June 10, 1925 (44 Stat. 2578), issued pursuant to the Act of June 8,1906 (34 Stat. 225). The parties have not stipulated to a taking date for Area six, some *135 2,634,744 acres of land, none of which, was included in any other taking. The commissioner concluded that except for eight small parcels for which patents were granted, Indian title to this area has not been extinguished. We agree with that conclusion and find that the eight areas held by aboriginal title were taken by the United States on that date when the patents were granted. These are the properties for which we must now find a value.
II
This court has held that equitable and just compensation for land held by Indian title is measured by the date-of-taking fair market value of the uncompensated for property rights. Miami Tribe of Oklahoma v. United States, 146 Ct. Cl. 421, 175 F. Supp. 926 (1959); Otoe and Missouria Tribe of Indians v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265 (1955), cert denied, 350 U.S. 848 (1955); Alcea Band of Tillamooks, et al. v. United States, 115 Ct. Cl. 463, 87 F. Supp. 938 (1950), cert. granted as to valuation, 340 U.S. 873 (1950), reversed as to award of interest, 341 U.S. 48 (1951); Hogue River Tribe of Indians, et al. v. United States, 116 Ct. Cl. 454, 89 F. Supp. 798 (1950), cert. denied, 341 U.S. 902 (1951); Shoshone Tribe of Indians v. United States, 85 Ct. Cl. 331 (1937), aff’d, 304 U.S. 111 (1938).
The fair market value of property, in the absence of an actual market, is the estimated or imputed fair market value based on sufficient evidence which justifies a conclusion as to the fair market value which would be established when an informed seller disposes of his property to an equally informed buyer. Miami Tribe of Oklahoma v. United States, sufra; Red Lake, Pembina and White Earth Bands, et al. v. United States, 164 Ct. Cl. 389 (1964); Otoe and Missouria Tribe of Indians v. United States, sufra.
Defendant has admitted that the proposed “value to the Indians” is without legal precedent and predicated solely on its interpretation of the jurisdictional act and our previous 1959 liability decision. ^References by this court in our earlier decision to various resources important to the Indians which could be considered in any determination of the fair market *136 value of their land does not authorize a “value to the Indians” valuation. The jurisdictional act does not refer to a standard of valuation other than equitable and just compensation for all claims.
Ownership by Indian title, although merely a possessory right of use and occupancy and, therefore, less than full fee simple ownership, is the complete beneficial ownership based on the right of perpetual and exclusive use and occupancy. The value of land held by Indian title is the same as that held in fee simple and not the value to its primitive occupants relying upon it for subsistence. United States v. Shoshone Indians, 304 U.S. 111 (1938); and United States v. Klamath Indians, 304 U.S. 119 (1938). Absent statutory modification, aboriginal title carries with it the same standard of valuation that would be applicable were the property held by recognized Indian title or by fee simple ownership. Minnesota Chippewa Tribe v. United States, 161 Ct. Cl. 258, 315 F.2d 906 (1963). The jurisdictional act neither by its terms nor its legislative history provides for any other valuation standard. We adopt the fair market value standard as correct and expressly reject the value to the Indians valuation procedure.
Reaffirming our position as originally adopted in Alcea Band of Tillamoooks, et al. v. United States, supra, and Rogue River Tribe of Indians, et al. v. United States, supra, in Otoe and Missouria Tribe of Indians v. United States, supra, we explicitly rejected the “value to the Indians” subsistence standard and stated that proper consideration must be given to :
* * * the natural resources of the land ceded, including its climate, vegetation, including timber, game and wildlife, mineral resources and whether they are of economic value at the time of cession, or merely of potential value * * *. [131 Ct. Cl. at 633, 131 F. Supp. at 290.]
Defendant objects, as a matter of law, to the determination of fair market value by separately appraising each component resource — timber, fisheries, game, townsites and other lands — and then cumulating these individually determined values to establish a fair market value. Allegedly, this violates the unit rule of valuation we stated in Yakima Tribe v. United States, 158 Ct. Cl. 612 (1962), whereby each land area *137 is valued as a whole in light of its highest and best potential use.
The procedure adopted by the commissioner, however, was to value each area as a whole.[2] Each land area had several exploitable resources, each of which was independently disposable. The single highest and best potential use of the resources of each tract within the larger area was considered. The total value of all tracts was the basis for a unit fair market value determination for each of the six areas. The decision in Ytikima, sufra, precludes duplication of value when a single tract of land is subject to multiple use. Each possible use for the same single tract of land may not be cumulated to determine its value. The total unit value of each area is the cumulative value of each tract within that larger area to which a single highest use of timber, forest or mineral value has been assigned. No single tract value is the total of all of the various uses to which it might have been put. This valuation procedure is appropriate in the absence of an actual market. See Alcea Band of Tillamoooks, et al. v. United States, supra; and Citizen Band of Potawatomi Indians of Oklahoma v. United States, 179 Ct. Cl. 473 (1967), cert. denied, 389 U.S. 1046; 390 U.S. 957 (1968).
In United States v. Emigrant New York Indians, et al., 177 Ct. Cl. 263 (1966), wherein an actual sales market and proof of comparable sales were similarly absent, we restated the factors and criteria upon which valuation under these circumstances is determined as:
* * * (a) the prevailing economic situation and the condition of the money market; * * * (c) the relative ease of accessibility to the area; (d) the effect of the existence of more suitable and marketable land in other areas; * * * (h) the existence of various minerals and other natural resources; (i) the existence, location, and extent of timber land within the tract; and (j) the proximity of the land to markets, distribution centers, and transportation facilities. [177 Ct. Cl. at 285]
*138 By taking into account the various factors upon which a market value for the whole area is found, the commissioner’s determination was in accord with our fair market value principles.
In Yakima v. United States, supra, we affirmed the procedure whereby the Indian Claims Commission valued the property as a whole by balancing the various factors which bear upon and establish a fair market value including available vegetation, timber, and communication and transportation facilities. The value established for the entire tract was premised on its single highest and best use as timberland or as timberland with limited grazing. The absence of any mineral, agricultural or wildlife value permitted assignment of only one use. We approved the rejection of a proposed valuation technique which would have separately appraised the various kinds of timber, the bare land, and the improvements on the same parcel of land. This would have given several values to the same tract of land by appraising its component parts.
The Tlingit and Haida lands were divided by area; each smaller tract within the area was assigned a single highest and best use. There is no duplication of value which might be created if each component potential use of the same acreage area were valued and then cumulated to obtain a value for that tract.
We can find no error in the commissioner’s acceptance of evidence as to the value of each tract, whether it be timber, minerals, etc. As a matter of fact, courts have permitted exactly this, especially when an ultimate overall finding of valuation is arrived at. See United States v. City of New York, 165 F.2d 526 (2d Cir. 1948); Code v. United States, 213 F.2d 138 (4th Cir. 1954); Uintah and White River Bands of Ute Indians v. United States, 139 Ct. Cl. 1, 152 F. Supp. 953 (1957) ; Aleea Band of Tillamooks, et al. v. United States, supra. Similarly, the Indian Claims Commission has relied upon testimony by experts of both petitioners and the government of separate values for separate classifications of land. Coeur D'Alene Tribe of Indians v. United States, 6 Ind. Cl. Comm. 1 (1957); The Snake or Piute Indians of the Former Malheur Reservation in Oregon v. *139 United States, 7 Ind. Cl. Comm. 526 (1959); Delaware Tribe of Indians v. United States, 8 Ind. Cl. Comm. 150 (1959); The Nez Perce Tribe of Indians v. United States, 8 Ind. Cl. Comm. 220 (1959).
We find that the fair market valuation procedure establishing a value for the whole area, after consideration of the various highest and best uses for each tract, was proper.
Ill
Eelying on the legislative history of the jurisdictional act and language in our decision on the issue of liability (147 Ct. Cl. 315, 341), plaintiffs have concluded that the United States failed to protect the exclusive occupancy and use of aboriginal Tlingit and Haida fishing rights in the waters both within and surrounding the external boundaries of the land areas in question. Because the defendant permitted non-Indians to extract fish and thereby violated plaintiffs’ alleged exclusive right to reduce the fish at a specific site to their possession, the commissioner permitted recovery in an amount equal to the fair market value of this lost, exclusive right on the date of taking of the land area adjacent to a particular fishery. This value was measured by the commercial profits earned by the non-Indian salmon canning industry which fished in these navigable waterways.
Plaintiffs’ expert reconstructed a hypothetical “excess profit” which the industry should have paid to the Indians for the right to fish in waterways otherwise subject to the exclusive proprietary fishing rights of the plaintiffs. The value of the fishery was determined by economic principles which established a derived demand for raw salmon based upon the known demand for canned salmon. Plaintiffs’ expert admitted that there are no comparable sales of a right to engage in commercial fishing and rejected a fair market valuation by measuring income of the fishermen selling to canneries because available data on the date of taking was inadequate.
Plaintiffs measure the fishery value by the profitability of the fish processing industry compared with the yield of alternative capital investment in industries with substantially comparable risks. The added profitability available from in *140 vestment in the fish processing industry is attributed to the income-producing potential of the fishery.
The valuation technique involves a tripartite subdivision of the price per case of canned salmon prevailing on the date of taking into estimated costs including a normal rate of return on invested capital, the “excess profit” to the cannery attributable to free access to the fisheries and the “excess profit” to independent fishermen selling to the cannery. The total of the two “excess profits” is the income attributable to free access to the fishery which was available only because the government failed to protect the rights of plaintiffs. To that total the expert added an additional income which he calculated would have been derived by more efficient fishing methods and an amount which private exploitation would have yielded. This total income from the fisheries, expressed as cents per case of canned salmon, is applied to a projected average annual income from the fisheries based on data from the period prior to and subsequent to the date of taking. From this he derived an expected average annual income, which when capitalized at a rate varying with the date of taking of each area, established a fair market value of the fishery resource.
The government by failing to protect these rights allegedly destroyed a private property right by making the area a common fishery. This inaction, the commissioner held, was sufficient to permit inclusion of the fishery in the valuation of the adjacent land areas. This was considered as a resource of the area and, therefore, compensable.
Each acre of land had been assigned a value based on the most profitable resource that it contained. Superimposed on the total value of an area was this additional .value of adjacent fishing locations, which, it is alleged, is a factor in establishing the market value of the land.
Albeit novel in approach, the valuation technique of plaintiffs, adopted by the commissioner, assumes the answer to the threshold question, i.e., whether or not there are compensable proprietary exclusive fishing rights, title to which might be established by proof of aboriginal Indian title to adjacent land areas. Neither the decisions of this court nor the juris- *141 diotional act provide for recovery of lost aboriginal fishing rights.
Since the primordial decision in Geer v. Connecticut, 161 U.S. 519 (1896), it has been uniformly held that there is no property right in any private citizen or group to wild game or to freely-swimming migratory fish in navigable waters. Fish are ferae naturae, capable of ownership only by possession and control. No citizen has any right to the fish nor to exclude any other citizen from an equal opportunity to exercise his right to possession. Shively v. Bowlby, 152 U.S. 1 (1894). This court has repeatedly adhered to that rule of law. Aleut Community of St. Paul Island v. United States, 127 Ct. Cl. 328, 334, 117 F. Supp. 427, 431 (1954). Cf., Bishop v. United States, 130 Ct. 01. 198, 126 F. Supp. 449 (1954), cert. denied, 349 U.S. 955 (1955); Fleming v. United States, 173 Ct. Cl. 426, 352 F.2d 533 (1965). There are no exclusive rights to fish in Indians. United States v. Winans, 198 U.S. 371 (1905).
An Indian tribe might exclude non-Indians from fishing in navigable waterways which are within its reservation if the grant of the reservation includes, as a part of that grant, the right to fish in designated areas free from interference. Alaska Pacific Fisheries v. United States, 248 U.S. 78 (1918); Moore v. United States, 157 F.2d 760 (9th Cir. 1946), cert. denied, 330 U.S. 827 (1947) ; Metlakatla Indian Community v. Egan, 369 U.S. 45 (1962); Oneida Tribe of Indians of Wisconsin v. United States, 165 Ct. Cl. 487 (1964), cert. denied, 379 U.S. 946. This is based on the implied or explicit grant of a right to fish undisturbed in accustomed aboriginal places.
Original Indian title, established by proof of occupancy and use of a particular area unrecognized by the United States in a treaty or a reservation grant, is ownership acquired by possession and domination for long periods of time. It is the actual, continued and exclusive use of a defined territory. Miami Tribe of Oklahoma v. United States, supra; Tee-Hit-Ton Indians v. United States, 128 Ct. Cl. 82, 120 F. Supp. 202 (1954), aff'd, 348 U.S. 272, reh. denied, 348 U.S. 965 (1955); Northwestem Bands of Shoshone Indians v. United *142 States, 324 U.S. 335 (1945), reh. denied, 324 U.S. 890, motion denied, 325 U.S. 840.
Navigable waterways have never been the property of adjacent land owners. It lias long been recognized that the sovereign owns the right to fish in the navigable waters and tide waters within its territorial boundaries. Martin v. Waddell, 41 U.S. 367 (1842); Manchester v. Massachusetts, 139 U.S. 240 (1891).
Free-swimming migratory fish in a navigable waterway are incapable of possession by ownership of adjacent lands. The right to fish in navigable waterways and reduce free-swimming fish to possession is not a concomitant of aboriginal title to adjacent land because the fish in a fishing area subject to Indian use can never be possessed.
We have previously concluded that aboriginal fishing rights did not exist. In Tee-Hit-Ton Indians v. United States, 132 Ct. Cl. 624,132 F. Supp. 695 (1955) we said:
It [the tribe] says that an Indian tribe, like any person, may acquire by immemorial usage, or at least might have so acquired, at the time it claims to have acquired its right, an exclusive right to fish in certain waters, even against the Government. [132 Ct. Cl. at 625,132 F. Supp. at 696]
The court therein found that there had been no grant to the Indians after our acquisition of the land from Russia in 1867. We did not determine if aboriginal rights existed. We did indicate, however, that whatever aboriginal rights there may be did not survive our acquisition from Russia.
Citizens of a sovereign do not possess rights of ownership beyond that which the sovereign itself might own. All ownership rights are subject to the paramount ownership of the sovereign. The government has been denied the power to create exclusive fishing rights in navigable waters even for Indians. Hynes v. Grimes Packing Co., 337 U.S. 86, 122-23 (1949); Organized Village of Kake v. Egan, 369 U.S. 60, 62 (1962); Metlakatla Indian Community v. Egan, supra.
An attempt to create an exclusive fishery was rejected by the Supreme Court in Hynes v. Grimes Packing Co., supra, wherein the court said, speaking through Mr. Justice Reed:
*143 It would! take specific and unambiguous legislation to cause us to rule that Congress intended to authorize the Secretary of Interior to alienate the Alaska fisheries permanently from public control, [at 105]
In Organized Village of Kake, supra, the Supreme Court, defined the right of these same Tlingit tribes to erect salmon traps at fishing sites designated by the Secretary of the Interior and to anchor them in the Tongass Forest. In 1960 the new state of Alaska enacted a statute forbidding salmon trap fishing. The Indians urged “that in using fish traps they were exercising an aboriginal right to fish.” The court did not answer the question whether there is a “property aboriginal right to fishing” but found that the state had power to regulate any aboriginal Indian rights that may exist.
The Alaska Supreme Court decision in Metlakatla Indian Community v. Egan, 362 P. 901 (1961), held that fishing “rights” were merely privileges given to the Indians in common with whites. That court held that no rights to fishing locations existed and, therefore, no such rights could be held by the United States for the benefit of the Indians.
The Supreme Court, construing a treaty with the Yakima Indians in United States v. Winans, supra, held that the Indian right to fish in accustomed places within their reservation was acquired by the reservation grant. This right was permitted by the United States. Fishing beyond those borders, 'however, was in common with all others. The only right in the Indians was a right of access to their accustomed fishing areas which imposed a servitude on land adjacent to their accustomed fishing places over which they might have to pass to reach their fishery.
Alaskan courts have consistently held that the first to occupy a trap or fishing location with a trap completed by the opening day of the salmon season in any year, is entitled to fish at that spot for the entire year. Fisher v. Everett, 11 Alaska 1, 66 F. Supp. 540 (D. Alaska 1945); General Fish Co. v. Markley, 13 Alaska 700, 105 F. Supp. 968 D. Alaska 1952). No person acquires any vested rights by virtue of possession in a prior year. Each location must be reoccupied the next year. There are no vested proprietary rights.
*144 We hold that there are no fishery rights based on aboriginal ownership of the land and that no right of recovery is established by the jurisdictional act. Moreover, were there a statutory right to compensation for a fishery, the value of the fish therein would not be an appropriate valuation technique.
Plaintiffs insist that the jurisdictional act includes a right to recover for lost fishing rights and that our prior decision affirmed their interpretation of the Act. Neither conclusion is accurate. The Act granted jurisdiction to adjudicate whatever existing rights the Indians may have and to award an equitable and just compensation.
Plaintiffs argue that recovery is authorized by the statement:
All claims of whatever nature, legal or equitable, which the said Tlingit and Haida Indians of Alaska may have, or claim to have, against the United States, for lands or other tribal or community property rights, * * * shall be submitted to the said Court of Claims * * * for the settlement and determination of the equitable and just value thereof, * * *. [141 Ct. Cl. at 343]
The references to tribal community property, it is alleged, indicates a congressional intent to provide for recovery of the value of lost fisheries. Plaintiffs concede that their right to recover is statutory and that, unless the reference to all tribal property rights includes a right to exclusive use of the fisheries, there is no recovery.
Plaintiffs interpret the term “property rights” as having included the fishing rights. Reading the legislative history of this Act as a whole we do not agree. Therefore, we find that there is no compensable statutory property right in migratory fish for which plaintiffs might receive compensation. Nor is there a property right to a fishery location based on aboriginal occupancy and use.
Indian occupancy rights are compensable only if there is a clear statutory directive creating a right to compensation. United States v. Alcea Band of Tillamooks, et al., 329 U.S. 40 (1946); Aleut Community of St. Paul Island v. United States, supra; Tee-Hit-Ton Indians v. United States, 348 U.S. 272 (1955). The Act determines both the extent of plaintiffs’ rights to recover and the jurisdiction of this court, *145 neither of which may be enlarged by imposing a liability on the government which it has neither explicitly assumed nor to which it has consented. Price v. United States and Osage Indians, 174 U.S. 378 (1899); Klamath and Moadoc Tribes of Indians v. United States, 296 U.S. 244 (1935).
The legislation was enacted to provide compensation for the land taken from these Indians and to provide compensation for the failure to aid and protect them in the manner in which neighboring tribes were protected. The land taken prevented access to the fishing site and denied the Indian his opportunity to fish as easily as had been previously possible. The value of the land and the resources on that land which enhanced its value, and to which they had title, are the only bases for compensation.
Earlier references to “land and water aboriginally used and occupied” (147 Ct. Cl. at 341) is not authority for recovery of the value of fishing areas or waters aboriginally used. Navigable waterways are not subject to private possession. Only such inland non-navigable streams and lakes which are within their territorial boundaries might be compensable.
The reference to the right or opportunity to fish in the area surrounding the land to which they held title does not establish an exclusive, compensable property right to extract all fish in a fishery. Exploitation of the opportunity to fish was made more difficult when the land was taken because access was then denied.
Land is the property for which liability was awarded in 1959. Fish in adjacent navigable rivers are not a resource of the land. The only added value which might accrue to the land because of the proximity to the fishery is the value of an easement over the land which provides both access to the fishery and an opportunity to exercise a common fisbiug privilege. This easement of access was taken.
A prospective purchaser would not pay for the right of access if alternative access was available without substantial additional cost or difficulty. Permitting non-Indians to fish in the area in common with the plaintiffs did not deprive them of the opportunity to take possession of the fish. Unless we conclude, which we do not, that the Indians owned the *146 right to remove all fish and, therefore, owned all of the fish, there is no compensable value lost when others fish in the area. There is no aboriginal right based on occupancy and use which gives the plaintiffs title to the fish or an exclusive right to remove all fish. We hold, therefore, that the value of the fisheries did not enhance the value of the land and, therefore, it is not properly includible in a computation of value for the land.
IV
We have previously discussed the propriety of valuing property as of the date of taking on the basis of sufficient proof of the fair market value established by a hypothetical prospective purchaser and a hypothetical seller. We now reach the question of townsite and settlement land valuation.
Areas two, three, and five do not have any acreage valued as townsite locations. Area one, taken in 1891, includes a value for the existing town of Metlakatla. Defendant does not challenge that award because the town had been settled, and the value as a town created, by Indians. We find the award for Metlakatla as a town and for the adjacent settlement lands proper.
Plaintiffs claim the value of the townsites in Areas four and six, as populated and settled on the stipulated dates of taking, and the fair market rental value of the towns during the period from original settlement to the date of taking.
The exclusive right to extinguish Indian title is in the United States. Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543 (1823) ; United States v. Santa Fe Pacific R.R. Co., 314 U.S. 339 (1941). Taking may occur by issuance of a patent for the land or actual taking by the United States. The Creek Nation v. United States, 302 U.S. 620 (1938) ; United States v. The Creek Nation, 295 U.S. 103 (1935), reh. denied, 295 U.S. 169.
. Defendant contends that the townsites as such have no additional value other than as acreage is valued generally in each area. This, it says, is true because the townsite values were increased by activities of white settlers. We reject this argument.
The parties have stipulated the date of taking of the land in Area four as February 16,1909, except for parcels patented prior to that date. If the townsites on those dates had a fair *147 market value of $716,940, tbe fact that the value had increased up to that date because of white settlers, etc., makes no difference. We are concerned with what the Indians owned at the taking date and what it was reasonably worth at that time.
A taking data for Area six has not been stipulated to by the parties. However, we think the taking date to have been the date the townsites were patented, which is the target date stipulated to in parts of Area four. The acreage in that area for which patents were issued was valued as of the date of such patents. The commissioner found that townsite lands on those dates had a fair market value of $61,494.
Because we have accepted the commissioner’s method of valuation in the circumstances of this case, and because the government, on brief, has accepted the commissioner’s amount, premised on our acceptance of his method, we conclude that the townsites in Areas four and six had a value, as of the pertinent dates of taking, of $778,484.[3]
*148 We also conclude that plaintiffs are not entitled to their claim for the fair market rental value of the townsite lands in Areas four and six, used and occupied by white settlers prior to the dates of taking, and calculated by taking five percent of the annual average value of the occupied portion of the townsite. The commissioner correctly found that plaintiffs proved neither the estimated annual value of the town-site land nor the basis for a five percent rental value.
y
Plaintiffs except to the finding of mineral values, arguing that the valuation criteria are erroneous as a matter of law and that they are improperly applied to the evidence. Purportedly, its evidence proves a value for unexplored mineral areas, and evidence of recorded mining interest sales were allegedly ignored.
The value of land includes the fair market value of its mineral content. Potawatomi Indians v. United States, supra. Mineral value is established by adequate proof of a fair market value indicating that removal of the deposit would be a profitable venture and would not involve exorbitant expense.
Proof either of actual profits from an existing mine or of prospective profits from a potential mineral area establishes the mineral value of the area. The valuation data amassed and the testimony offered by plaintiffs do not establish the required factual proof of the mineral area’s prospective profitability which could be translated into a market value for the mineral deposit. Those factors to which a court looks in ascertaining value, which are not proved probable, remain mere speculation and may not be the basis for valuing property. Olson v. United States, 292 U.S. 246 (1934); Morton Butler Timber Co. v. United States, 91 F.2d 884 (6th Cir. 1937).
After consideration of the speculative nature of the mining venture in unexplored mining areas, the absence of any existing production in the area, the cost of development and the removal and transportation of the minerals, the trial commissioner found that the prospective profitability of the ven *149 ture was not established'. In the absence of proof that the venture would be profitable, no fair market value can be found. We find that the procedure of valuation was correct and that, as applied, plaintiffs did not sustain their burden of proof as to value by establishing that removal of the mineral lode on the date of taking would be profitable.
Plaintiffs have offered proof of recorded sales of the mineral interests as speculations. This proves only the value of property as a speculation but does not establish the value of the mineral. The supply and demand for a speculative property does not establish the value of the mineral. The fair market value of a speculation does not enhance the value of the land or the value of a mineral deposit. The purchase of a right to explore does not prove the value of the minerals which the purchaser believes to be present in the land.
Plaintiffs proved the value of mined mineral in those areas for which compensation was awarded, by proof of the value of the ore as a removed and processed commodity. This established that removal was profitable and the fair market value based on the known value of the mineral deposit was determined. We find the denial of any value for unexplored mining areas for insufficient proof correct.
VI
The failure to find a value for hemlock forest lands is also excepted to as not in accord with the standard of just compensation provided for in the jurisdictional act.
Plaintiffs assert that two subsidiary findings which generated the ultimate conclusion that hemlock forest lands were not significantly valuable are invalid and unsupported by the evidence. These are the findings that (1) there was an insignificant demand, if any, for hemlock forest land; and (2) the price and demand levels for timber in the Pacific Northwest and British Columbia were not comparable to those of southeast Alaska.
The speculative nature of investment in Alaskan hemlock timber areas on the date of taking is not in doubt. The availability, in quantity, of hemlock in the Pacific Northwest and general oversupply in more accessible areas argues against *150 establishing a value for these remote hemlock forests based on the supply and demand in British Columbia or the Pacific forests. The date-of-taking value to a prospective purchaser is the only pertinent value and that value, we find, was minimal.
The absence of proof that it had a merchantable value or that the timber was accessible for commercial exploration justifies denial of any significant value. Chippewa Indians of Minnesota v. United States, 87 Ct. Cl. 1 (1938), aff'd, 805 U.S. 479 (1939); The Warm, Spring Tribe of Indians of Oregon v. United States, 103 Ct. Cl. 741 (1945). The assignment of a low value to these forest lands was proper.
Both the ultimate and underlying findings of the commissioner are correct and amply supported by the evidence, except that (1) the commissioner has found a total value for alleged fishing rights of $7,521,500 (Area one, $94,000; Area two, $2,678,000; Area three, $60,000, Area four, $3,661,-000; Area five, $1,028,500); and (2), he awarded $866,815 (Areas one-five, $664,605; Area six, $202,210) as damages for the failure of the United States to protect these rights prior to the date of taking. We have concluded that these findings relating to fishing rights are incorrect.
Upon consideration of the arguments of counsel, the evidence presented and the report of Commissioner Gamer, to whom we are indebted for his report, we conclude that the plaintiffs are entitled to recover $7,546,053.80 (the commissioner’s total award of $15,934,368.80, less the fishing awards of $8,388,315) as equitable and just compensation for all of their claims against the United States.

 The commissioner has made findings relative to value to the Indians of fishing rights which the court has rejected, we, however, have included said findings for background purposes only.

 At this point we note that the defendant accepts the valuation figures found by the commissioner, if we accept his method of valuation. In oral argument, government counsel stated that the amount found is fair to the Indians and fair to the government. Further, in its brief, the defendant mates this statement: “Nevertheless in an effort to end this litigation we accept the amounts determined by the Commissioner * *

 The total townsite value of $778,434 was established as follows:
Area 4 ($716,940) :
Juneau:
Pre-1909 patent value_ $111, 835 1909 value_ 10, 000
- $121, 835
Douglas: 1909 value_ 35, 000
156, 835
Skagway:
Pre-1909 patent value_ 89, 375
1909 value_ 128,230
217, 605
Ketchikan:
160, 000 1909 value_ Sitka:
37, 500 1909 value_ Wrangell:
Pre-1909 patent value_ 69, 900
1909 value_ 2, 000
71, 900
Petersburg:
Pre-1909 patent value_ 13, 600
1909 value_ 59, 500
73,100
716, 940
Area 6 ($61,494) :
1910-1913 patent value_ 7,120
1918 value_ 54, 374
- 61,494
$778, 434